UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
JEREMIAH DOMINGUEZ, an infant, by his   :
mother and natural guardian CYNTHIA     :
DOMINGUEZ, and CYNTHIA DOMINGUEZ,       :    10 Civ. 4296 (DLC)
individually,                           :
                    Plaintiffs,         :    OPINION AND ORDER
                                        :
            -v-                         :
                                        :
YVES VERNA, M.D., et al.                :
                    Defendants.         :
                                        :
----------------------------------------X

Appearances:

For the plaintiffs:
Robert Vilensky
Ronemus & Vilensky
112 Madison Avenue
New York, NY 10016

For the defendants Morris Heights Health Center, Inc.,
Kelly Fitzgerald, Marcia Jones, and Yorleny Sherrier-McKnight:
Christine Irvin Phillips
Preet Bharara
United States Attorney's Office
for the Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007

For the defendants Yves Verna, Jing Ja Yoon, and Bronx Lebanon
Hospital Center:
Cheryl M. Wendt
Shaub, Ahmuty, Citrin & Spratt, LLP
655 Third Avenue
New York, NY 10017

DENISE COTE, District Judge:

     The plaintiffs Jeremiah Dominguez ("Jeremiah") and his

mother Cynthia Dominguez ("Dominguez," and together,

"Plaintiffs") allege claims for medical and nursing malpractice, lack of informed consent, and loss of services against the medical and nursing staff at two different medical facilities based on the circumstances surrounding Jeremiah's birth in 2006. Defendants Morris Heights Health Center, Inc. ("Morris Heights"), Kelly Fitzgerald, Marcia Jones, and Yorleny Sherrier-McKnight (together, the "Federal Defendants") have moved to dismiss all of the Plaintiffs' claims against them for lack of subject matter jurisdiction.[1]  For the following reasons, the Federal Defendants' motion to dismiss the Plaintiffs' claims is granted only with respect to the claim based on lack of informed consent.

BACKGROUND

I.   Jeremiah's Birth and Medical Care

Dominguez began receiving pre-natal care at Morris Heights when she was eight weeks pregnant.  At that time, she was twenty years old and had completed high school.  She received pre-natal care at Morris Heights fourteen times between December 2005 and July 2006.  On August 1, Jeremiah was born at Morris Heights via

---

[1] The Federal Defendants also move to dismiss the cross-claim for contribution and/or indemnification filed against them by the co-defendants Bronx-Lebanon Hospital Center ("Bronx-Lebanon"), Yves Verna, Jing Ja Yoon, and Lubna Baig (together, the "Co-Defendants") for lack of subject matter jurisdiction.  Decision on this motion is reserved.

"normal spontaneous vaginal delivery" at full term.  The Plaintiffs' medical records do not disclose any complications during labor.

Jeremiah was not breathing when he was born.  He received "respiratory support" in the delivery room and was quickly transferred by ambulance to Bronx-Lebanon.  There, he was placed on a ventilator in the neo-natal intensive care unit.  He suffered two seizures that day and was placed on the anti-seizure medication phenobarbital.

While Jeremiah was at Bronx-Lebanon, several tests were performed to assess his brain functioning.  An ultrasound of his head, EEG, CAT scan, and MRI[2] were performed in the first eight days of Jeremiah's life.  The ultrasound did not show any bleeding in the brain or lesions, but the CAT scan revealed "findings consistent with asphyxia injury."  The MRI also showed "asphyxia brain injury."  The EEG was "grossly abnormal" and reflected a non-specific "severe hypoxic-ischemic insult."[3]  When Jeremiah left Bronx-Lebanon on August 17, a discharge summary included these results and also described Jeremiah's physical

---

[2] An EEG, or electroencephalogram, records brain waves.  An MRI, or magnetic resonance imaging, scan is a diagnostic technique that produces computerized images of internal body tissues using radio waves.  These and all other medical definitions are taken from the Federal Defendants' briefs.

[3] Hypoxia is a deficiency of oxygen reaching tissues of the body. Ischemia is a deficient supply of blood to a body part.

condition as "normal," including that he was pink and had a good cry and good movement.

Medical and other diagnostic records describe conversations with Dominguez about Jeremiah's medical condition.  On August 7, 2006, Jeremiah's neonatologist and neurologist met with Dominguez and Jeremiah's father and "discussed in detail" that Jeremiah showed signs of "HIE" and that his seizures were one indicator of that diagnosis.  HIE refers to hypoxic ischemic encephalopathy, which is damage to cells in the central nervous system (the brain and spinal cord) from inadequate oxygen.  On November 11, 2006, Jeremiah was evaluated by New York Child Resource Center for an assessment of his overall development. The evaluator wrote in her assessment that she relied on clinical observations and a parent interview to perform the evaluation.  The evaluator wrote: "Mother reports" that Jeremiah failed to breathe at birth, was placed on a ventilator, and that "placenta was sent to lab for test.  It was determined that the baby was not receiving enough oxygen in-utero."  In a physical therapy evaluation the following day, the evaluator stated that the parents gave her all pertinent information, which included that Jeremiah's MRI showed hypoxic ischemic injury.

Dominguez took Jeremiah to a neurologist for follow-up care four times between August 2006 and March 2007.  The medical records from those appointments describe a diagnosis of

encephalopathy, ischemic injury, and seizure disorder, or
alternatively, hypoxic ischemic encephalopathy and seizure
disorder.  At a subsequent appointment in September 2007, the
neurologist's report reflects that Jeremiah was at or below the
5th percentile in weight, height, and head circumference, that
he had a history of cerebral palsy, was experiencing seizures,
drooled, and was unable to sit without help.

Dominguez has provided an affidavit regarding what she
understood about Jeremiah's medical condition.  Dominguez
testifies that her delivery was "uneventful" and she was not
informed of any complications or trauma from the birth.  She
testifies that no one at Morris Heights gave her any information
about why Jeremiah was not breathing when he was born.  She also
denies that anyone at Bronx-Lebanon gave her "a specific
diagnosis" or "any information about why [Jeremiah] was born not
breathing or why he had seizures."  She denies that anyone
discussed any test results with her and says she was "led to
believe" that Jeremiah was "healthy" when he was discharged from
Bronx-Lebanon.  With respect to the November 2006 evaluations,
Dominguez testifies that the evaluator "reviewed a full set of
medical records" in addition to speaking with Dominguez and that
Dominguez was informed at that time that Jeremiah had "some mild
developmental delay but there was no cause for concern at that
time."  Dominguez testifies that she "believed that [Jeremiah's]

condition was unavoidable and its cause unknown" because "[n]o one, at anytime [sic] explained to [her] the cause of his condition."

On August 11, 2008, Jeremiah was hospitalized for dehydration at Montefiore Medical Center ("Montefiore"). Dominguez testifies that a neurologist at Montefiore diagnosed Jeremiah with cerebral palsy and mental retardation, and that it was the first time that she had heard either of these diagnoses. Dominguez testified that "[t]he neurologist explained to [her] that mental retardation can occur as a result of lack of oxygen at birth. This was the first time anyone had informed me of the possible cause of [Jeremiah's] injuries." "Shortly thereafter," Dominguez testified that she saw a legal services advertisement on television that stated that "mental retardation and cerebral palsy may be actionable." She then retained her present counsel.

II.  Procedural History

On February 12, 2009, the Plaintiffs commenced this action in New York Supreme Court, alleging medical and nursing malpractice, lack of informed consent, and loss of services against all of the defendants presently named in the action (the "Removed Action"). On May 11, 2009, Dominguez filed a Notice of Claim against the United States with the Department of Health and Human Services ("HHS").

On February 25, 2010, after the HHS failed to issue a final decision on Dominguez's administrative claim within six months, the Plaintiffs commenced an action in the Southern District of New York by filing a complaint similar to the complaint in the Removed Action.  The complaint was given docket number 10 Civ. 1589 and assigned to this Court (the "Federal Action").  At an initial conference with the Court on April 30, 2010, the parties agreed that the Federal Action would be dismissed and that the Removed Action would proceed in federal court following its removal.  By letter dated May 3, HHS denied Dominguez's administrative claim as untimely on the ground that it was filed more than two years after her cause of action accrued.

On May 10, while the Removed Action was still pending in state court, the Co-Defendants filed a cross-claim against the Federal Defendants for contribution or indemnification in that case.  On May 26, the United States Attorney certified that all of the Federal Defendants were acting within the scope of their employment at all relevant times, and were therefore deemed to be employees of the United States ("scope certification"). Based on the certification, the Government filed a Notice of Removal on May 28, 2010 pursuant to 28 U.S.C. §§ 1442(a)(1), 2679(d)(2), and 42 U.S.C. § 233(c).  The Removed Action was accepted as related to the Federal Action and given docket number 10 Civ. 4296.  A stipulation of dismissal of the Federal

Action was filed on June 7.  The stipulation conveys the parties' understanding that the claims in the Removed Action and the Federal Action are the same and that the United States would substitute itself as the proper defendant in place of the Federal Defendants in the Removed Action.[4]

On July 27, the Federal Defendants moved to dismiss all claims and cross-claims against them for lack of subject matter jurisdiction.  Both the Plaintiffs and the Co-Defendants opposed the motion, which was fully briefed on November 18.

DISCUSSION

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), "[d]etermining the existence of subject matter jurisdiction is a threshold inquiry, and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Arar v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008) (citation omitted).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008)

_____

[4] Despite indicating that they would bring a motion to substitute the United States as the defendant, the Federal Defendants have not yet done so.  This oversight does not affect the outcome of the motion.

(citation omitted).  "The court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  Id. (citation omitted).  A district court may consider evidence outside the pleadings when resolving a motion to dismiss for lack of subject matter jurisdiction.  Id. (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)).

I. Timeliness of Plaintiffs' Claims

A. Statute of Limitations Under the FTCA

Morris Heights is a community health center that receives federal grant funding pursuant to the Public Health Service Act. 42 U.S.C. § 254b(a)(1).  Under the Federally Supported Health Centers Assistance Act ("FSHCAA"), Congress extended medical malpractice coverage under the Federal Tort Claims Act ("FTCA") to community health centers like Morris Heights.  Thus, the United States may deem community health centers and their employees to be employees of the United States, 42 U.S.C. § 233(g)-(n), which provides the facilities and their employees with medical malpractice coverage under the FTCA.  The Federal Defendants were so deemed during the relevant periods.  Thus, in order to sue them for medical malpractice, the plaintiff must comply with the requirements of the FTCA.

"The FTCA waives the United States's sovereign immunity for certain classes of tort claims." Celestine v. Mount Vernon Neighborhood Health Ctr., 403 F.3d 76, 80 (2d Cir. 2005). Pursuant to the FTCA, federal district courts "shall have exclusive jurisdiction over damages claims against the United States for injury or loss of property, or for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). But, the FTCA requires a plaintiff to exhaust all administrative remedies before filing suit. Celestine, 403 F.3d at 82. In order to pursue a claim under the FTCA, the plaintiff must have "first presented the claim to the appropriate Federal agency." 28 U.S.C. § 2675(a). If the agency denies the claim or more than six months pass without the agency making a final decision, the plaintiff is entitled to file a lawsuit in federal district court. Id. The FTCA's exhaustion requirement "is jurisdictional and cannot be waived." Celestine, 403 F.3d at 82.

There is a statutory exception to the FTCA's requirement that a plaintiff must file an administrative claim before proceeding to federal court. If a plaintiff files suit in state court within two years of the date on which his claim accrued, the Federal Employees Liability Reform and Tort Compensation Act

("Westfall Act"), 28 U.S.C. § 2679, provides a way for such a
suit to continue.  After the Attorney General or his designee
makes the scope certification, the case "shall be removed" to
the district court and "shall be deemed to be an action or
proceeding brought against the United States . . . and the
United States shall be substituted as the party defendant."
Id.; see also Osborn v. Haley, 549 U.S. 225, 229-30 (2007).
Upon scope certification and removal, the case proceeds as any
other case under the FTCA.  The law affords a plaintiff in that
situation sixty days after dismissal to file an administrative
claim and six months from the denial of that claim to recommence
the lawsuit.  Valdez ex rel. Donely v. United States, 518 F.3d
173, 177 (2d Cir. 2008); 28 U.S.C. § 2679(d)(5).

   B. Diligence Discovery Rule

     Assuming, without deciding, that the Plaintiffs may take
advantage of the Westfall Act,[5] their claim must have accrued
within two years of February 12, 2009, the date on which the
Plaintiffs filed suit in state court.  The Federal Defendants
contend that Dominguez knew or should have known of her claim no
later than November 11, 2006, months before February 12, 2007.

---

[5] The Plaintiffs have not relied on the Westfall Act in their
motion papers.  The Federal Defendants argue that even if the
Plaintiffs could take advantage of the earlier date, their claim
accrued prior to February 12, 2007, and is still time-barred.

"The date on which an FTCA claim accrues is determined as a matter of federal law." Syms v. Olin Corp., 408 F.3d 95, 107 (2d Cir. 2005). "A claim under the Federal Tort Claims Act accrues on the date that a plaintiff discovers that he has been injured." Valdez, 518 F.3d at 177. Ordinarily, a plaintiff discovers that he has been injured when the injury occurs, but "where plaintiff would reasonably have had difficulty discerning the . . . cause of injury at the time it was inflicted", the claim accrues when "the plaintiff has or with reasonable discovery should have discovered the critical facts of both his injury and its cause." Id. (citation omitted and emphasis supplied). This is called the "diligence discovery rule." Id. "[A] claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice." Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998) (citation omitted). In order for a medical malpractice claim to accrue under the FTCA, the plaintiff must understand "that the injury he suffered related in some way to the medical treatment he received." Valdez, 518 F.3d at 177 (emphasis supplied).

A patient may have an obligation to seek information about whether the harm he suffered may relate to the medical treatment he received. The statute of limitations begins to run "when a reasonably diligent person (in the tort claimant's position)

reacting to any suspicious circumstances of which he might have been aware would have discovered" that the injury may be related to the medical care.  Id. at 178 (citation omitted).  A "mere hunch, hint, suspicion, or rumor of a claim" is not enough, "but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence." Kronisch, 150 F.3d at 121.

II.  Waiver of Informed Consent Claim

In addition to claims for medical malpractice, the Plaintiffs allege that the Federal Defendants failed to secure Dominguez's informed consent for the treatment she received. The Federal Defendants argue that the informed consent claim must be dismissed for failure to exhaust administrative remedies because the Plaintiffs never presented this claim to the HHS. The Plaintiffs have not opposed this portion of the Federal Defendants' motion and it is granted.

CONCLUSION

The Plaintiffs' claim with respect to informed consent is dismissed.  A hearing will be held to determine the date on

which the Plaintiffs' claim accrued.   A hearing date will be set
by separate scheduling order.


          SO ORDERED:

Dated:      New York, New York
            December 3, 2010


                                    _____
                                              DENISE COTE
                                    United States District Judge