UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
J.D., an infant, by his mother and      :
natural guardian JANE DOE, and JANE     :
DOE, individually,                      :         10 Civ. 4296 (DLC)
                         Plaintiffs,    :
                                        :         OPINION & ORDER
                                        :         ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                  -v-                   :
                                        :
UNITED STATES OF AMERICA,               :
                         Defendant.     :
                                        :
----------------------------------------X

Appearances:

For the plaintiffs:
Michael Ronemus
Ronemus & Vilensky
112 Madison Avenue
New York, NY 10016

For the defendant:
Christine Irvin Phillips
United States Attorney's Office
for the Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007

DENISE COTE, District Judge:

     This is a tragic case.  Two loving parents ("Mother" and
"Father") have a son, J.D., who has brain damage, cerebral
palsy, and a seizure disorder.  This is their first and only
child.  He is now almost four and a half years old.  They have
sued the birthing center ("Center") where J.D. was born for
medical malpractice.  The Government, which is legally
responsible for the medical care provided at the Center, has

1

moved to dismiss for lack of subject matter jurisdiction because this suit was not filed within the two year period permitted by the Federal Employees Liability Reform and Tort Compensation Act ("Westfall Act"), 28 U.S.C. § 2679.

To be timely, as explained in the Opinion of December 3, 2010 ("December 3 Opinion"), this claim must have accrued after February 12, 2007. <u>J.D. ex rel. Doe v. United States</u>, No. 10 Civ. 4296 (DLC), 2010 WL 4942225, at *5 (S.D.N.Y. Dec. 3, 2010). The Government contends that Mother, who is bringing this lawsuit on behalf of her son, knew at the time of J.D.'s birth on August 1, 2006, or shortly thereafter, that her child had suffered an injury at birth and knew or should have known at that time that that injury was probably related in some way to the medical treatment he received at the Center.

Mother now admits that she knew her son suffered an injury at birth.  She contends, however, that she did not understand either the severity of the injury or that the injury related in some way to the medical treatment J.D. received at the Center until October 2007, when her conversation with a neurologist at Montefiore Hospital ("Montefiore") made that apparent to her.

Based on a hearing conducted from January 10 to 13, 2011, the Government has shown that the claim accrued in August 2006 or shortly thereafter, and that this litigation is time-barred.

2

A reasonably diligent person in the circumstances of Mother, and aware of the circumstances of J.D.'s birth, as she was, would have had a duty as of August 2006 or shortly thereafter to inquire as to the possible existence of a medical malpractice claim against the Center.  Indeed, the preponderance of the evidence shows that Mother and her family actually discussed their discontent with the medical care given by the Center and the Center's responsibility for J.D.'s medical problems in the early Fall of 2006.

BACKGROUND

I.   J.D.'s Birth and Neonatal Care

Mother was a 21 year old, newly married woman, when she gave birth to her first child, J.D., at the Center on August 1, 2006.  Mother is the oldest of five children, the youngest of whom was roughly three years old at the time.  Her parents, siblings, mother-in-law and husband were with her at the Center during her 16-hour labor.

When J.D. was born, he was not breathing.  He was given oxygen and taken by ambulance to the Natal Intensive Care Unit ("NICU") at Bronx-Lebanon Hospital ("Bronx-Lebanon").  Father accompanied him in the ambulance and into the hospital.  The parents learned that day that J.D. had suffered seizures

3

following his birth.  The birth and transfer to the hospital were dramatic and put both parents and Mother's entire family on notice that J.D. had been born with a serious health issue.  At Bronx-Lebanon, J.D. was quickly placed on a regimen of phenobarbital to reduce the risk of seizures.  Both parents understood that this was a powerful drug with adverse side-effects and was being prescribed because of J.D.'s susceptibility to seizures.

J.D. remained in the NICU for the next seventeen days.  On August 7, Dr. Shabbir, a pediatric neurologist, reviewed the results of his examination and the results of an EEG and CAT scan of J.D.'s brain, met with Father and Mother and explained to them that their child had suffered brain damage.  Dr. Shabbir predicted that J.D. would have developmental delays but could not predict how severe or mild they would be.  On August 9, an MRI was conducted on J.D., showing brain damage abnormalities. Dr. Shabbir shared the MRI results with Father and Mother.

When J.D. was released from Bronx-Lebanon on August 17, the parents were given follow up appointments with doctors, including an August 25 appointment with Dr. Shabbir.  They were instructed to administer their son phenobarbital and given referrals to the visiting nurse service and high-risk clinic. Mother knew by that day that J.D. was not healthy and had brain

damage caused by a lack of oxygen.  She also knew that he could have seizures and delays in development.  Also by the time of discharge, Father felt that the Center's staff could have been more diligent to prevent his son's injury and that his family had had a bad experience with them.

II.  J.D.'s Care and Development until February 12, 2007

In late August or early September 2006, shortly after bringing J.D. home from Bronx-Lebanon, Mother's family discussed the possible cause of J.D.'s injury in the presence of his parents.  They expressed anger at the midwife and medical staff at the Center for not doing more or transferring Mother to the hospital for labor.  Among other things, they discussed the fact that the staff had assured the family that everything was going fine and that the baby was strong.  They reminded each other how the staff had told Mother's mother that she was worrying too much and had rejected her request that Mother be transferred to a hospital because the labor was taking too long and Mother was struggling.  Mother told her family that she wished she had given birth in a hospital.  This conversation recurred several times over the next few months.

The EEG, which was intended to detect whether J.D. was still experiencing non-clinical seizures despite the

administration of phenobarbital, had been scheduled on September 7, 2006.  J.D.'s parents missed this appointment.

On October 31, Mother visited Dr. Shabbir so that he could renew the prescription for phenobarbital and examine J.D.  He told Mother that J.D. had a smaller-than-average head circumference.  While J.D.'s head size had been in the 50th percentile at birth, it was now, at the three-month mark, in the 5th percentile.  Dr. Shabbir explained to Mother that the fact that J.D.'s head was not growing normally, along with other signs, made the likely prognosis worse and that J.D. would have many problems in the future.  Dr. Shabbir recommended that the EEG appointment be rescheduled, that J.D. return for another clinic examination in two months, and that he receive physical and occupational therapy through the New York State Early Intervention Program.  Mother understood from this visit that her child might not develop normally.

On November 11, in the presence of both parents in their home, physical therapist Martha Londono conducted an examination of J.D. for the Early Intervention Program.  She wrote in her report that his physical function was in the second percentile for his age and that his development was that of a one-month-old child.  Among other things, she noted that the baby was unable to put weight on his forearms, kept his hands in fists, and had

6

a reflex that limited his ability to reach and to keep his head in symmetry with his body.  Ms. Londono discussed her observations with the parents and explained what they meant for their child's development, although she did not discuss the percentile and age ranking.  These facts were included, however, in the typewritten report of the examination delivered to the parents in both English and Spanish.  The parents read the report.  This evaluation qualified J.D. for physical and occupational therapy, which he began shortly thereafter.

The following day, November 12, J.D. was evaluated by a bilingual special educator from the New York Child Resource Center.  The evaluation noted that he was developmentally delayed in his motor skills, including holding his hands in fists, not being able to hold objects, losing head control, hyperextending his body and not bringing his hands together at his midline.  The evaluation noted that J.D. was at risk for delays and these results were discussed with Mother.

J.D. was seen by a social worker as part of the Early Intervention Program on December 3.  As reflected in the report of that evaluation, Mother reported to the social worker that J.D. was easily startled, unable to extend his legs, kept his hands in fists, and could not hold his bottle without assistance.

On January 2, 2007, J.D. was again seen by Dr. Shabbir, whose examination notes indicated that Father and Mother had still not scheduled an EEG for J.D.  Dr. Shabbir explained to the parents that J.D. would have problems in the future and was going to need "a lot of services."

III. J.D.'s Care and Development After February 12, 2007

Another evaluation by Dr. Shabbir was conducted on March 6. In the notes about that visit, Dr. Shabbir reported that Mother had informed him of J.D.'s increased "startling" since the phenobarbital had been discontinued.  It also noted that the EEG had still not been conducted on J.D.  Several reports of physical and occupational therapists dated May 2007 indicate that at that time Mother was reporting difficulty feeding her child and continued physical delays in his development.

IV.  Return of Seizures and Admission to Montefiore

In the first two weeks of September 2007, J.D. had his first noticeable seizures since the period immediately after his birth.  Mother took J.D. to see Dr. Shabbir on September 14, and he recommended new medication to control the seizures.  This was the first time that Dr. Shabbir's notes included the term "cerebral palsy" in reference to J.D.'s condition.

On September 27, Father and Mother took J.D. to Montefiore for treatment of his seizures.  The parents reported that J.D.'s

seizures had started six weeks earlier.  They described him as having cerebral palsy, having had respiratory distress at birth, having suffered brain damage and seizures, and being prescribed phenobarbital.  J.D. was admitted to the hospital, where he stayed for at least two weeks to undergo a study to measure the frequency and types of seizures he was experiencing.  At least three different types of seizures were identified.

On October 1, 2007, the parents meet with Dr. Cecilia Laureta, a pediatric neurologist at Montefiore.  Dr. Laureta explained to the parents in clear and simple terms the devastating brain injury that their child had suffered.  In making her evaluation, she relied on the parents' description of J.D.'s history and the results of tests and studies performed at Montefiore.  She did not have access to the child's prior medical records.  Dr. Laureta explained that J.D. had "holes" in his brain.  She also explained that children with cerebral palsy can be profoundly affected or only mildly affected, and that only time would tell how profoundly affected J.D. would be, but that the condition was hard to treat.  She explained as well the most common causes of cerebral palsy, one of which was a lack of oxygen at birth.  In her view, while problems with the delivery could lead to oxygen deprivation, that was only one of the possible explanations.

During this conversation, Father inquired whether one of the causes of cerebral palsy could be medical malpractice, and whether they should find a lawyer and sue. Dr. Laureta responded that they, of course, had a right to consult with legal counsel about their child's condition. But, she did not tell Father and Mother that they should or needed to see a lawyer or that malpractice had occurred, as Father asserts. Nor did she tell them that the injury must have occurred during delivery. As she did not have access to the medical records of the Center or Bronx-Lebanon, she was in no position to make such a judgment.

V.   Credibility

Six witnesses testified at the hearing. Doctors Shabbir and Laureta and Ms. Londono, all of whom testified at trial, were each entirely credible. They had no present recollection of these events and conversations, but testified based on their contemporaneous records and customary practices.

Portions of the testimony of both Father and Mother were patently false. The responsibility for this false testimony rests not only with them but also with their counsel.

For example, in opposition to the Government's motion, Mother presented an affidavit of September 7, 2010 in support of her argument that her claim did not accrue until August 2008.

10

The affidavit falsely states, <u>inter alia</u>, that the staff at Bronx-Lebanon never discussed J.D.'s test results with her, that she was led to believe that he was healthy at his discharge from Bronx-Lebanon, and that she first heard from a neurologist at Montefiore in August 2008 that her son had cerebral palsy and mental retardation.  While the plaintiffs take the position that the reference to August 2008 was intended to refer to their conversation with Dr. Laureta on October 1, 2007, during J.D.'s first admission to Montefiore, that explanation is incredible. August 2008 is just one month before Mother retained her attorneys.  The sole purpose of the affidavit was to establish the date on which inquiry notice began, and there could be no honest confusion between a date within weeks of retaining counsel and one that occurred almost one year earlier.[1]

Mother's direct testimony, contained in an affidavit of January 9, 2011, also contained many falsehoods.  It falsely stated, <u>inter alia</u>, that at the time of discharge she thought her son was fine except that he was at risk of seizures, that she had not noticed any developmental delays as of November 2006, that an evaluator for the Early Intervention program told her that the results of the evaluation showed that J.D. was normal, that as of the end of 2006 she understood that J.D. was

---

[1]   During summation, plaintiffs' counsel apologized for this error.

normal but for his risk of seizures, and that up to the time he
was admitted to Montefiore in September 2007, J.D. seemed to be
developing normally.

Father's direct testimony, contained in an affidavit of
January 9, falsely stated, inter alia, that Dr. Shabbir told him
that the testing at Bronx-Lebanon did not show anything, that
J.D. was progressing well during the first six months of his
life, including holding a bottle, that the first time he ever
heard the diagnosis of cerebral palsy was when Dr. Laureta used
the term, that Dr. Laureta explained that the way the Center
delivered J.D. led to his oxygen deprivation, that he did not
know until this conversation that J.D. had an injury, and that
Dr. Laureta told them that they may have a malpractice claim and
should speak to an attorney.

The testimony Father and Mother gave at the hearing
contradicted their affidavits, their deposition testimony, the
medical and treatment records, and the testimony of other
witnesses at the hearing.  They both minimized the extent of
their understanding of J.D.'s condition and the possible cause
of it at the time of his birth and the period immediately
following that.  They did so because they understood that it is
critical for them to explain why they did not file suit earlier
than they did.  One final example of their willingness to give

12

false testimony will suffice.  Both of them asserted during their depositions that they first became aware of the Center's malpractice when they discussed J.D.'s condition with Dr. Laureta during his hospitalization in September and October 2007.  Confronted with this testimony, which was not included in the plaintiffs' written opposition to the defendants' motion to dismiss, the Government subpoenaed Dr. Laureta to testify at the hearing.  Mother, and to a lesser extent, Father, then changed their trial testimony about their conversations with Dr. Laureta in significant respects.

In sum, this was an extraordinarily traumatic birth for these young parents, as it would have been for anyone.  They blamed the Center for their problems, but loved their child deeply and hoped that with the care and treatment that he was being given the impact from the lack of oxygen could be mitigated and that the brain damage would not be too severe. They hoped that he would, with time, catch up to his peers.  As he got older and his problems and developmental delays became more apparent to them, and particularly after he experienced another set of seizures, they decided to get care at another medical facility.  When they heard Dr. Laureta describe J.D.'s condition on October 1, 2007, they experienced for the first time the full emotional shock of their circumstances.  They

confronted at that time the enormity of the problems facing J.D. They felt anger and embarrassment and began their journey to find counsel.  They found their current counsel about one year later, in September 2008, and filed suit on February 12, 2009.

## VI.  Procedural History

The plaintiffs commenced this action in New York Supreme Court, alleging medical and nursing malpractice, lack of informed consent, and loss of services against all of the defendants presently named in the action (the "Removed Action"). The filing on February 12, 2009 was just over two and a half years following J.D.'s birth.

On May 11, 2009, Mother filed a Notice of Claim against the United States with the Department of Health and Human Services ("HHS").  The Notice of Claim does not identify any specific act of negligence or proposed theory of causation of J.D.'s injuries, which are listed in the Notice of Claim as "encephalopathy, brain damage, hypoxia, respiratory distress and . . . seizures."

On February 25, 2010, after HHS failed to issue a final decision on Mother's administrative claim within six months, the plaintiffs commenced an action in the Southern District of New York by filing a complaint similar to the complaint in the Removed Action.  The complaint was given docket number 10 Civ.

1589 and assigned to this Court (the "Federal Action").  At an initial conference with the Court on April 30, 2010, the parties agreed that the Federal Action would be dismissed and that the Removed Action would proceed in federal court following its removal.  By letter dated May 3, HHS denied Mother's administrative claim as untimely on the ground that it was filed more than two years after the cause of action accrued.

On May 26, the United States Attorney certified that the Center, Kelly Fitzgerald, Marcia Jones, and Yorleny Sherrier-McKnight (together, the "Federal Defendants") were acting within the scope of their employment at all relevant times, and were therefore deemed to be employees of the United States ("scope certification").  Based on the scope certification, the Government filed a Notice of Removal on May 28, 2010 pursuant to 28 U.S.C. §§ 1442(a)(1), 2679(d)(2), and 42 U.S.C. § 233(c).  The Removed Action was accepted as related to the Federal Action and given docket number 10 Civ. 4296.  A stipulation of dismissal of the Federal Action was filed on June 7.  The stipulation conveys the parties' understanding that the claims in the Removed Action and the Federal Action are the same and that the United States would substitute itself as the proper defendant in place of the Federal Defendants in the Removed Action.

On July 27, the Federal Defendants moved to dismiss all claims against them for lack of subject matter jurisdiction. The plaintiffs opposed the motion, which was fully briefed on November 18.

An Opinion dismissing the claim with respect to informed consent and setting out the law on the claim accrual date issue was issued on December 3, 2010.  On January 10, 2011, the parties stipulated that all claims against Bronx-Lebanon, Dr. Yves Verna and Dr. Jing Ja Yoon and their cross claims would be dismissed with prejudice.  On January 10, 11 and 13, a hearing was held on the claim accrual issue.  A stipulation was entered on January 19 substituting the United States of America for the Federal Defendants.


DISCUSSION

This Opinion completes the analysis begun in the December 3 Opinion, which set out the legal framework for evaluating the timeliness of a claim brought under the Federal Tort Claims Act ("FTCA").  J.D., 2010 WL 4942225.  For the purposes of this Opinion, the Court assumes familiarity with the analysis of the December 3 Opinion.

I.  Claim Accrual

The Court assumes, without deciding, that the plaintiffs may take advantage of the Federal Employees Liability Reform and Tort Compensation Act ("Westfall Act"), 28 U.S.C. § 2679, and that their claim must have accrued within two years of February 12, 2009, the date on which the plaintiff filed suit in state court.  The defendant contends that plaintiffs knew or should have known of their claim no later than November 11, 2006, months before February 12, 2007.

"The date on which an FTCA claim accrues is determined as a matter of federal law." Syms v. Olin Corp., 408 F.3d 95, 107 (2d Cir. 2005).  "A claim under the Federal Tort Claims Act accrues on the date that a plaintiff discovers that he has been injured." Valdez ex rel. Donely v. United States, 518 F.3d 173, 177 (2d Cir. 2008).  Ordinarily, a plaintiff discovers that he has been injured when the injury occurs, but "where plaintiff would reasonably have had difficulty discerning the . . . cause of injury at the time it was inflicted," the claim accrues when "the plaintiff has or with reasonable discovery should have discovered the critical facts of both his injury and its cause." Id. (citation omitted).  This is called the "diligence-discovery rule." Id. (citation omitted).  "[A] claim will accrue when the plaintiff knows, or should know, enough of the critical facts of

17

injury and causation to protect himself by seeking legal advice." Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998) (citation omitted).  In order for a medical malpractice claim to accrue under the FTCA, the plaintiffs must understand "that the injury he suffered related in some way to the medical treatment he received." Valdez, 518 F.3d at 177 (emphasis supplied).

Plaintiffs' claim accrued no later than October 2006, when they were on notice of the possibility that J.D.'s injury was caused by medical malpractice.  It is therefore untimely, as their complaint was filed more than two years later.

A. Knowledge of Critical Facts of Injury

The plaintiffs became aware of the critical facts of J.D.'s injury during his hospitalization at Bronx-Lebanon shortly after his birth.  They were first put on notice that J.D. had a serious health issue by his traumatic birth, his transfer to the hospital, and the significant intervention required to stabilize his condition and control his seizures.  While he was in the NICU, Father and Mother were told that J.D. had suffered brain damage and would have developmental delays.  By the time J.D. was discharged from Bronx-Lebanon on August 17, 2006, Mother knew that he had suffered brain damage caused by a lack of oxygen and was not healthy.  She also knew that J.D. could have

18

additional seizures and delays in development.  Over the next
five months, J.D. was evaluated by various specialists,
including a pediatric neurologist, a physical therapist, a
special educator and a social worker, all of whom reported that
J.D. was showing signs of developmental delays, including
severely diminished head growth.  Each of these specialists
shared their evaluations with J.D.'s parents.  Mother was
therefore aware of the critical facts of J.D.'s injury no later
than August 17, 2006, and the information she received in the
following few months confirmed what she had learned at Bronx-
Lebanon.

Plaintiffs argue that they were not sufficiently aware of
J.D.'s injury before February 12, 2007 because the significance
of his injury was not evident for several months after birth and
because he had not been given a specific diagnosis at the time
of discharge from Bronx-Lebanon.  They stress that they had not
been told that J.D. had cerebral palsy until his examination at
Montefiore in September or October 2007.

First, cerebral palsy is a general term used to describe "a
disability resulting from damage to the brain before, during, or
shortly after birth, and outwardly manifested by muscular
incoordination and speech disturbances." T.L. v. United States,
443 F.3d 956, 962 (8th Cir. 2006) (citing Merriam-Webster's

Medical Desk Dictionary 129 (rev. ed. 2005)).  While there is no evidence that anyone used that term to describe J.D.'s condition before February 12, 2007, J.D.'s parents knew within days of his birth that J.D.'s lack of oxygen at birth had caused brain damage.  They also were aware that as a result of that brain damage, he had experienced seizures and was at a risk for more seizures and delays in development.  They learned in the months immediately after birth that J.D.'s head size was below the fifth percentile for infants at his age and his physical function was in the second percentile, also as a result of brain damage.  In November and December, evaluators and therapists discussed J.D.'s muscular deficits with his parents.  Indeed, the irrelevance of the term cerebral palsy is evident from its absence from the plaintiffs' notice of claim, which lists instead J.D.'s "encephalopathy, brain damage, hypoxia, respiratory distress and . . . seizures," each of which describes conditions of which J.D.'s parents had been aware since J.D.'s hospitalization at Bronx-Lebanon.

More importantly, "plaintiff need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim" for his claim to accrue.  Kronisch, 150 F.3d at 121 (citation omitted).  A plaintiff simply may not "postpone bringing an action until the full extent of that

20

damage is ascertained." Toal v. United States, 438 F.2d 222,
225 (2d Cir. 1971).  A specific diagnosis of cerebral palsy or
an improved understanding of the severity of brain damage is the
type of information that is not necessary for a claim to accrue.
"The accrual of a claim based on brain injury at birth is not
tolled merely because the injury worsens and develops into
cerebral palsy." T.L., 443 F.3d at 962 (claim accrued when
plaintiff was aware that her child suffered brain damage, not at
later date when she was informed that daughter had cerebral
palsy); see also Mendez ex rel. Martinez v. United States, 655
F. Supp. 701, 705-06 (S.D.N.Y. 1987).

B. Duty of Inquiry into Doctor-Caused Harm

When it is not clear that an injury was doctor-caused
("iatrogenic"), a plaintiff's claim accrues once he has an
obligation to seek information about whether the harm he
suffered may relate to the medical treatment he received.  A
"mere hunch, hint, suspicion, or rumor of a claim" may not be
enough, "but such suspicions do give rise to a duty to inquire
into the possible existence of a claim in the exercise of due
diligence." Kronisch, 150 F.3d at 121.  Therefore, the statute
of limitations begins to run "when a reasonably diligent person
(in the tort claimant's position) reacting to any suspicious
circumstances of which he might have been aware would have

discovered" that the injury may be related to the medical care.
Valdez, 518 F.3d at 178 (citation omitted).   The duty arises
when plaintiff has sufficient information to have strong
suspicions of iatrogenic harm, "not necessarily of negligent
iatrogenic harm."   Id. (citation omitted).

Many of the circumstances surrounding J.D.'s birth should
have, and did, alert plaintiffs that his injury might have been
iatrogenic.   Mother knew that she had experienced an uneventful
pregnancy, yet at birth her son stopped breathing, was rushed to
the hospital, and suffered seizures and brain damage.   She was
aware that his condition was a result of a lack of oxygen at
birth.

Moreover, Father and Mother actually believed that poor
medical care at the Center had caused J.D.'s brain injury.
Father testified that by the time he took J.D. home, he had
formed the opinion that the Center's staff could have been more
diligent to prevent his son's injury and that his family had had
a bad experience with them.   Shortly after J.D. was discharged
from Bronx-Lebanon, the family of Mother discussed the
circumstances of J.D.'s birth and the possible cause of J.D.'s
injury in the presence of his parents.   They discussed how the
staff had discounted their worries that Mother was struggling
and that the labor was taking too long.   The family expressed

22

anger at the Center for not transferring Mother to the hospital for labor.  Mother told her family that she wished she had given birth in a hospital instead of the Center.[2]

Having such complaints and concerns about the quality of medical care at the Center and its role in J.D.'s injury, his parents had a duty to investigate their claim.  See Kronisch, 150 F.3d at 122.  The facts as they knew them, and their suspicions about the fault of the Center staff, would have led a reasonable person to seek professional advice to help determine probable causation of her child's injury.  See Johnson ex rel. Haynes v. United States, 460 F.3d 616, 622-23 (5th Cir. 2006) (claim accrued when plaintiff knew that some injury could have occurred at birth).  Therefore, by the time that plaintiffs had suspicions of possible iatrogenic harm, which was no later than October 2006, they had a duty to investigate the cause of J.D.'s injury.

Plaintiffs argue that they were not given any information by medical staff at the Center and Bronx-Lebanon that would have

---

[2]    Plaintiffs argue that suspicions by family members should not be imputed to them.  But, these family members had been with Mother during her labor at the Center.  Once they shared their opinions with J.D.'s parents, the parents were on notice of the possibility that medical malpractice had a role in J.D.'s injury and had at the time a duty to inquire into the cause. Furthermore, both Mother and Father expressed their own concerns before February 12, 2007 about the medical care at the Center.

caused them to suspect that J.D.'s injury was iatrogenic, and that the reports by the specialists who evaluated J.D. shortly after his birth include no indication that the parents believed his injury was the result of medical malpractice. Nevertheless, the circumstances surrounding his birth caused Father and Mother, as well as Mother's family, to suspect that J.D.'s injury was connected to poor medical care. That these suspicions may not have been shared with visiting specialists is not evidence that plaintiffs were not on notice of possible iatrogenic harm.

Plaintiffs argue that their claim could not have accrued on the date of J.D.'s birth, citing Valdez, 518 F.3d at 178-79. But in Valdez, the Second Circuit remanded the case for further proceedings so that the date of accrual -- the date the plaintiff "had reason to suspect that the cause of [her daughter's] injury was related to her medical treatment" -- could be determined. Id. at 180. Similarly, in A.Q.C. v. United States, 715 F. Supp. 2d 452 (S.D.N.Y. 2010), plaintiff's claim accrued on the date "plaintiff's mother was told that she should explore a medical malpractice claim," as "[n]othing before the Court indicate[d] that the plaintiff's mother had any prior awareness that her daughter's medical difficulties might be attributable to malpractice." Id. at 459. Here, the record

needs no further development.  By the time J.D. was discharged
from Bronx-Lebanon, or at least shortly thereafter, Mother and
Father already suspected that J.D.'s injury was related to the
medical care he had received at the Center.

Plaintiffs also cite three cases where parents of children
who had suffered brain injury were found to have brought timely
claims.  Hance v. United States, 773 F. Supp. 551 (W.D.N.Y.
1991); Mendez, 655 F. Supp. 701; Lee v. United States, 485 F.
Supp. 883 (E.D.N.Y. 1980).  These cases predate this circuit's
controlling decisions on the diligence discovery rule in Valdez
and Kronisch and are called into question by contrary appellate
case law on nearly identical facts.  See Johnson, 460 F.3d at
622-23 (claim accrued when plaintiff knew it was probable that
cause of child's brain damage was an event at birth); T.L., 443
F.3d at 962 (claim accrued when plaintiff suspected iatrogenic
harm despite the fact that no doctor had informed her that this
was a possibility).  Furthermore, unlike here, in none of those
three cases was the plaintiff given sufficient information to
connect a problem that occurred at birth with the brain injury
or shown to have been actually aware of a potential iatrogenic
cause.

II.  Equitable Tolling

In a letter submitted to the Court after the conclusion of the hearing, plaintiffs argue for the first time that their claim should be equitably tolled.  Equitable tolling is appropriate if the plaintiffs can show that (1) they diligently sought to obtain information vital to their claim and to pursue their rights and (2) a special circumstance prevented them from filing a timely claim.  See Valdez, 518 F.3d at 182-83. "[E]quitable tolling is only appropriate in rare and exceptional circumstances."  Zerilli-Edelglass v. N.Y. City Transit Auth., 333 F.3d 74, 80 (2d Cir. 2003) (citation omitted).

Plaintiffs' tolling argument, which was not made in their opposition to the defendant's motion to dismiss, their surreply to that motion, or at any time during the hearing, is not timely and has been forfeited.  See Raniola v. Bratton, 243 F.3d 610, 613 n.1 (2d Cir. 2001); Hamilton v. Atlas Turner, Inc., 197 F.3d 58, 61-62 (2d Cir. 1999).  As the Government points out, the failure to raise this argument before a post-trial letter has deprived the parties of the opportunity to conduct discovery to determine if the plaintiffs were diligent in pursuing their claim during the period (still undefined by plaintiffs) which they seek to have tolled.  Indeed, at the hearing, the

plaintiffs repeatedly objected to the admission of evidence of events occurring after February 12, 2007.

Nor have the plaintiffs pointed to any "extraordinary or exceptional circumstances warranting equitable tolling." Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000).  Plaintiffs argue that their delay was the result of being unaware that the Center was a federally-funded facility, and that claims against it would therefore be subject to the statute of limitations under the FTCA.  This is not an extraordinary circumstance.  The statute of limitations is not tolled "simply because a plaintiff is unaware that an alleged tortfeasor is a federal employee." T.L., 443 F.3d at 964.  Plaintiffs have not alleged that the government "misled or deceived [them], or otherwise hid[] the legal identity of alleged tortfeasors as federal employees." Id.  Therefore, "the cause of action still accrues when the existence of an injury and its cause are known." Id.

Plaintiffs' characterization of their lack of awareness about the relationship between the Center and the federal government as a special circumstance is further undermined by the readily available information on this subject.  As noted in A.Q.C., 715 F. Supp. 2d 452, "the issue of federally-funded health centers in FTCA cases is not an obscure or infrequent one" and the list of federally-funded health centers in the New

27

York City area, including the Center, appears on the Health Resources and Services Administration website. Id. at 463 (rejecting equitable tolling); see Health Resources and Services Administration, Find a Health Center, http://findahealthcenter.hrsa.gov (last visited Jan. 26, 2011). Plaintiffs' counsel have also encountered this issue before, having already represented clients bringing medical malpractice claims against federally-funded facilities. See, e.g., Duncan v. Sound Shore Med. Cent., No. 07 Civ. 3094 (KMK) (S.D.N.Y. filed Apr. 17, 2007).


CONCLUSION

　　Pursuant to the FTCA, plaintiffs' claim against the United States is untimely.  Their claim is dismissed for lack of subject matter jurisdiction.  The Clerk of the Court shall enter judgment for the defendant.


SO ORDERED:

Dated:　　New York, New York
　　　　　January 28, 2011

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　DENISE COTE
　　　　　　　　　　　　United States District Judge




28